## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATE OF AMERICA, AND
THE STATE OF DELAWARE,
ex rel. SHERRY SCHARFF, L.P.N.,
AND WALTER T. DECYK, III, L.P.N.,

   Plaintiffs,

      v.

IHS, INC., a Pennsylvania corporation;
TRANS HEALTHCARE, INC.,
a Maryland corporation ;
GREEN ACRES HEALTH SYSTEMS,
INC., a Pennsylvania corporation,
ALLEN SEGAL; GARY SEGAL; GREEN
VALLEY PAVILION; GREEN
VALLEY TERRACE; MARY CASPER;
DENISE RHINEHARDT; SANDY
EDWARDS; JEFF BLAKE;



   Defendants.

:   CIVIL ACTION NO. 04-105

:   JURY TRIAL DEMANDED

:   FILED IN CAMERA

:   AND UNDER SEAL

---

## SECOND AMENDED COMPLAINT AND CIVIL ACTION
## FILED UNDER THE FEDERAL FALSE CLAIMS
## ACT, 31 U.S.C. et seq. AND THE DELAWARE FALSE
## CLAIMS AND REPORTING ACT, DEL. CODE ANN. TITLE 6 §§1201-09

This is the Second Amended Complaint, filed as an action to recover damages against the above named defendants for violations of the Federal False Claims Act, and the Delaware False Claims and Reporting Act, for violations of the law under the Federal Medicare and Medicaid and the State Medicaid laws and regulations.

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1345; 31 U.S.C. §3729 et seq.; and Del. Code Ann. Title 6, §§1201-09.

2.     Venue is proper in this District under 28 U.S.C. §§1391(b) and (c); and 31 U.S.C. §3729 et seq.

**INTRODUCTION**

3.     This lawsuit is filed by the United States of America, and the State of Delaware, by relators Sherry Scharff, L.P.N., and Walter T. Decyk, III, L.P.N. These parties are collectively referred to as "Plaintiffs."

4.     Ms. Scharff is a License Practical Nurse, and was formerly employed in that capacity at the Green Valley Pavilion, from approximately December, 1999, until January 24, 2004. When Ms. Scharff first came to the facility, it was owned and operated by IHS, Inc.

5.     Mr. Decyk is a Licensed Practical Nurse, and was formerly employed in that capacity at the Green Valley Pavilion from February, 2003 to October, 2003.

6.     Mr. Decyk was formerly employed as an LPN at the Green Valley Terrace, Millsboro, DE. from approximately August, 2002, to February, 2003. Mr. Decyk left his

employment at Green Valley Terrace to become employed at Green Valley Pavilion.

      7.      At the time of Ms. Scharff's first employment at the Green Valley Pavilion facility,
that nursing home was owned by IHS Inc., (Hereinafter, "IHS"). Upon information and belief,
Trans Healthcare, Inc. is a successor in interest of IHS.

      8.      Green Acres Health Systems purchased the facility from IHS in or about January,
2001, and renamed the facility Green Valley Pavilion.

      9.      Trans Healthcare Inc., a Maryland corporation, owned and operated the Pavilion
site from approximately 1993 until its sale to Green Acres in 2001. At all times relevant to this
complaint, IHS held itself out as a licensed health care facility, providing health care in compliance
with state and Federal law.

      10.     Green Valley Pavilion, and Green Valley Terrace (hereinafter, "Green Valley"), are
fully owned and operated by Green Acres Health Systems, Inc., a Pennsylvania corporation
(hereinafter, "Green Acres").

      11.     Green Acres owns health care facilities in the states of Pennsylvania, Delaware,
and Maryland.

      12.     Green Acres' facilities in Pennsylvania include Buckingham Valley Rehabilitation
and Nursing Center, Buckingham, PA; Green Acres Rehabilitation and Nursing Center,
Wyndmoor, PA; and Richboro Care Center, Richboro, PA.

      13.     Green Acres' facilities in Maryland include Riverview Care Center, Essex, MD.

      14.     The allegations complained of in this complaint began at least in December, 1999,
and continue up to today. Upon information and belief, these allegations began in 1993.

15.    While the allegations of this complaint are specific to the two Delaware facilities, upon information and belief these issues are present at all Green Acres facilities.

## **DEFENDANTS**

16.    Trans Healthcare Inc., is a Maryland corporation with offices for the service of process as listed above upon information and belief.  Upon information and belief, Trans Healthcare is a successor in interest of IHS.  IHS owned a nursing home in Smyrna, formerly known as IHS-Smyrna, from at least 1993 to 2001.

17.    ████████████████████████████████████████████████████

18.    ████████████████████████████████████████████████████

19.    Green Acres Health Systems, Inc., is a Pennsylvania corporation with offices for the service of process as listed above.  Green Acres has been in existence since 1949, and has been under the ownership of Allen Segal since 1984.

20.    Allen Segal has been both the President and Vice President of Green Acres since January, 1984.  At all times, Mr. Segal has acted in both his official and personal capacity in regard to the allegations of this complaint.

21.    At all times relevant to this complaint, Mr. Allen Segal knew, should have known, or was in reckless disregard of the allegations complained of herein.

4

22.    Gary Segal is the brother of Allen Segal. At all times relevant to this complaint, Gary Segal has been the treasurer and Chief Financial Officer of Green Acres Health Systems. At all times, Mr. Gary Segal has acted in both his official and personal capacity in regard to the allegations of this complaint.

23.    At all times relevant to this complaint, Mr. Gary Segal knew, should have known, or was in reckless disregard of the allegations complained of herein.

24.    Green Valley Pavilion ("The Pavilion") is an approximately 148 bed nursing home, and rehabilitative facility, located as listed above. At all times relevant to this complaint, the Pavilion held itself out as a reputable nursing home and rehabilitation facility, providing care within the guidelines and law as proscribed by state and Federal agencies, in particular Medicare and Medicaid.

25.    Green Valley Terrace is an approximately 100 bed nursing home and rehabilitative facility, located as listed above. At all times relevant to this complaint, The Terrace held itself out as a reputable nursing home and rehabilitation facility, providing care within the guidelines and law as proscribed by state and Federal agencies, in particular Medicare and Medicaid. Mary Lou Groff is the Director of Nursing, a position she has held since January, 2003. Upon information and belief, Ms. Groff was the assistant director of nursing from January, 2002 until January, 2003.

26.    At all times relevant to this complaint, Mary Casper has acted in her official capacity, first as Director of Nursing at the Pavilion, and then as Nursing Home Administrator at the Pavilion, and in her personal capacity.

27.    Mary Casper knew, should have known, or was in reckless disregard, of the

5

allegations of the complaint contained herein.

28.    At all times relevant to this complaint, Sandy Edwards has acted in her official capacity, as Director of Nursing, first at the Terrace, and then at the Pavilion, and in her personal capacity.

29.    Ms. Edwards was previously employed as a Medicare and/or Medicaid surveyor, and therefore had above average knowledge of the workings of the Medicare and/or Medicaid system of payments by the Federal and state of Delaware Government.

30.    Sandy Edwards knew, should have known, or was in reckless disregard, of the allegations of the complaint contained herein.

31.    At all times relevant to this complaint, Denise Rhinehardt has acted in her official capacity, as Licensed Practical Nurse, and as the Restorative Care Nursing coordinator, at both Green Valley locations; and in her personal capacity.

32.    Denise Rhinehardt knew, should have known, or was in reckless disregard, of the allegations of the complaint contained herein.

33.    At all times relevant to this complaint, Jeff Blake has acted in his official capacity, as a Licensed Practical Nurse employed by Green Acres, and in his personal capacity.

34.    Jeff Blake knew, should have known, or was in reckless disregard, of the allegations of the complaint contained herein.

35.    ████████████████████████████████████████████

6

36.

37.

38.

39.



40.

41.

42.

43.

44.

45.

46.

47.

48.

49.

50.

51.



52.

53.

54.

## SPECIFIC ALLEGATIONS

**A.    UPCODING OF PATIENT CONDITIONS AND TREATMENTS**

55.    Plaintiffs incorporate paragraphs 1 through 54 as though set out at length herein.

56.    Patients routinely are required to be evaluated upon admission to defendant Green Acres.

57.    These admission evaluations must be completed within a reasonable amount of time to insure proper evaluation, treatment, and diagnosis of the patients.

58.    Based upon these evaluations, physician orders are written for the patients.

59.    Based upon these evaluations and medical records, Medicare is billed.

10

59a.    Medicare is a program of the Federal government, created by Title XVIII

of the Social Security Act. The Medicare law is codified at 42 U.S.C. §§1395 et

seq., and its regulations are located in main part at Title 42 C.F.R. Part 400-420.

Medicare is billed for skilled nursing care to patients under a Prospective Payment

system, or PPS. The Federal Government pays prospectively for patient care

based upon patient diagnosis and required treatment.

59b.    Based upon the particular diagnosis and need for treatment, care, and

assistance, Medicare patients are assigned for billing purposes to a

particular Resource Utilization Grouping (RUG's). Nursing homes are

then paid a particular amount of money under the PPS based upon a

particular patient's RUG.

59c. The RUG paid for a particular patient takes into account the assistive

services provided to the patient, including physical therapy, occupational

therapy, and speech therapy. The patient's need for general assistance in

performance of the activities of daily living is also considered in the

payment scheme under Federal Medicare laws and guidelines.

60.    Based upon these evaluations and medical records, Medicaid is billed.

60a.    Medicaid is a program of the Federal government, created by Title XIX of

the Social Security Act. The Medicaid law is codified at 42 U.S.C. §§1396 et seq.,

and its regulations are located at Title 42 C.F.R. Part 483. The Medicaid system

relies upon state and Federal funds to pay for the care of patients in nursing homes

11

based upon a partial payment system of the Federal government whereby the

Federal government pays a fixed proportion of the costs of care related to the

economic status of the state's participants.

60b.    Medicaid, like Medicare, pays for patient care based upon patient

diagnosis, need for treatment, and need for care and assistance.

60c.    The baseline Medicaid payment can be elevated based upon a particular

patient's additional needs for services, including but not limited to

rehabilitative care, need for assistance with movement or ambulation; skin

breakdown issues related to immobility; the existence of current skin

wounds; behavioral difficulties; and need for more skilled nursing care.

These additional payments are known as Medicaid Add-On's.

61.    Defendants Rhinehardt, Edwards, Casper, and Green Valley routinely alter the

medical records regarding patient care to make it appear that patients require more care than they

actually need; or that they can benefit from restorative care when they are too ill to receive any

such benefit. Defendant IHS, by and through Defendant Rhinehardt, routinely altered patient

records while IHS owned the facility. Such alterations are in violation of 42 CFR §483.20, which

requires a comprehensive, accurate, and reproducible assessment of patient's functional capacity,

and requires that this assessment accurately reflect the patient's current status.

62.    Defendants Rhinehardt, Edwards, Casper, and Green Valley routinely perform

services for which they are not licensed or which is illegal, by altering medical records and

documentation regarding patient care. These actions similarly occurred while Defendant IHS

12

owned the facility. These actions are similarly in violation of 42 C.F.R. §483.20 regarding resident assessments and records.

63.    For example, Defendants Rhinehardt and Edwards have written physician orders, and ordered treatments for patients as if they were the patient's treating physician. Such falsifications have occurred on patients FF , GG, HH, II, JJ, KK, LL, MM, NN, OO, PP, QQ, RR, and SS.

64.    Defendant Edwards has signed physician orders, falsifying physician signatures.

65.    Defendants Rhinehardt and Edwards have written Medicare and Medicaid certification and recertification documents. Such documents include those for patients B, H, and YY. These actions are in violation of 42 C.F.R. §424.20(e), which require physicians to sing and authorize the level of care required.

66.    Defendants Edwards has falsified the signatures of physicians on these Medicare and Medicaid documents.

67.    These false signatures and certifications were done to increase the levels of care required for patients.

68.    For example, Defendants Rhinehardt and Edwards have ordered all patients to receive Passive Range of Motion, three times a day, for ten minutes each time, to the patients' extremities. Defendants signed these orders by falsifying doctor's signatures; or by taking supposed verbal orders for the care that are never signed by physicians.

68a.    Passive range of motion, or PROM, is a physical therapy exercise that requires training to provide.

13

68b.    PROM is a physical therapy and/or rehabilitative activity that increases

payments to nursing homes, by increasing a patient's RUG under Medicare,

and by creating an add-on under Medicaid.

68c.    Defendants Rhinehardt and Edwards have falsified physician signatures to

these orders for PROM, or taken these orders for PROM as verbal orders

and never received physician authorization for this care. This occurred in

patients FF , GG, HH, II, JJ, KK, LL, MM, NN, OO, PP, QQ, RR, and

SS.

68d.    For example, Defendants Rhinehardt and Edwards have written physician

orders for PROM on patients' charts who are fully ambulatory, who

require no or minimal assistance in activities of daily living, including but

not limited to patients A, Q, QQQ, and RRR . The orders for ROM are

included in every chart, whether the patients need it or not.

68e.    Patient RRR, for example, is ordered to receive PROM. This particular

patient is ambulatory, using a walker; and walks with a walker outside of

the facility to smoke a cigarette, without any supervision.

68f.    For example, Defendants Rhinehardt and Edwards have written physician

orders for PROM on patients' charts who are so physically disabled and/or

contracted as to not be able to have PROM performed, including but not

limited to patient S. These actions are, for example, in violation of 42

C.F.R. § 483.25 (e), related to use of range of motion in Medicaid patients.

14

68g.   Defendants Rhinehardt, Edwards, Casper, and Green Valley have
repeatedly reminded the nurses and certified nursing assistants ("CNA's")
of their obligation to provide this PROM treatment.  This same situation
was occurring while Defendant IHS owned the Pavilion.

68h.   Defendants Rhinehardt, Edwards, Casper, Green Valley and Green Acres
have repeatedly failed to provide instruction to the nurses and CNA's on
the proper provision of PROM.  CNA's have been instructed that merely
assisting a patient with getting dressed is PROM.  This same situation
occurred while Defendant IHS owned the Pavilion.  These actions   are, for
example, in violation of 42 C.F.R. § 483.25 (e), related to use of range of
motion in Medicaid patients to improve or maintain range of motion, since
these exercises are of no value.

68i.   Despite a repeated failure to document the provision of even inadequate
PROM, Defendants Rhinehardt, Edwards, and Casper have certified on
state and Federal documents that these patients required, and were
receiving, actual and beneficial PROM.  This same situation occurred while
Defendant IHS owned the Pavilion.

68j.   Upon information and belief, this falsification of documents and
upcoding of care required was occurring in all patients of Defendants IHS,
Green Valley and Green Acres.

69.   Treatments for patients with wounds to their skin are being misrepresented in

15

medical records and documents, for purposes of upcoding the level of care required for patients.
These Defendants intentionally fail to adequately assess patient's conditions, as required by 42
C.F.R. § 483.20.

69a.     In at least one case, patient UUU was diagnosed by Defendant Edwards
as having Stage I wounds on her heels bilaterally.

69b.     Based upon that evaluation, medical orders were written and medical
treatments ordered for this patient to care for her alleged heel wounds.

69c.     The existence of Stage I wounds on a patient's skin would allow this
patient to receive Medicaid add-on payments based upon the need for
preventative skin care. (Medicaid Add-On code).

69d.     Upon examination by Ms. Scharff and Mr. Decyk, this patient did not have
any wounds, or area of breakdown, on either heel.

69e.     Upon information and belief, this type of violation occurs with
other patients throughout the Green Valley facilities, to allow a Medicaid
Add-On for Preventative Skin Care to be placed on the patient's chart.

70.     Part of the requirement of providing care to wound patients, and others, is the
provision of dietary services. Defendants upcode patient care by certifying that dietary services
are offered when they, in fact, are not. These actions are in violation of the state of Delaware
Eagle's Law, and Medicare and Medicaid requirements that nursing homes provide nutrition
suitable to meet the nutritional needs of their patients. See, e.g., 42 C.F.R. §483.35.

70a.     For instance, all patients with wounds are required, by Green Acres own

16

Policy and Procedure manuals, to be provided dietary consultation.

70b.    Medicare and Medicaid regulations require that patients receive dietary services to maintain and improve their quality of life. See, e.g., 42 C.F.R. § 483.35.

70c.    Medical records contain documentation that this care is provided for the patients.

70d.    Despite this documentation, wound patients are not given any special diet to assist in their wound healing.

70e.    Indeed, many of these patients, who are also diabetic, are receiving traditional diets and regular calorie and carbohydrate food. In most instances, these patients are receiving snacks of Nutty Buddy Ice Cream and peanut butter and jelly sandwiches. In several instances, Relators have had to take these snacks from the hands of these patients. In several instances, Relators have been told that the facility does not provide ADA diets.

71.    Treatment records were and are altered to make patient conditions appear more serious than they actually are, thereby increasing the amounts of payments requested for particular patients. These records make it appear as if patients are in the same condition at present as they were upon admission; when instead they have suffered a deteriorated condition. These actions are in violation of Medicare and Medicaid regulations requiring accurate assessments. See 42 C.F.R. §483.20; 42 C.F.R. §424 Subpart D.

17

71a.  Each patient is required to have a Functional Care Summary in place. The Functional Care Summary is the primary document used in the State of Delaware to bill Medicare and Medicaid for the care level of each patient.

71b.  A Functional Care Summary, or FCS, is a summary supposedly prepared at admission, and updated monthly. The FCS lists the care being provided to each patient; patient care problems and issues; patient care goals; and patient care needs.

71c.  Each month, the FCS is required to be updated to reflect changes in condition; changes in necessary care; and new or changed patient care needs.

71d.  The care, problems, and issues listed on the FCS are used to support Medicare and Medicaid documentation, billing and reimbursement.

71e.  On a regular basis, Defendants Rhinehardt and Edwards remove several months worth of FCS from charts, destroy these existing FCS, and create new FCS.

71f.  These new FCS alter patients actual medical conditions, to make them appear to have been more sick, and/or have required more care, at the first month of the FCS. It appears that the patient's condition has not altered, or has only worsened slightly, during the course of their nursing home stay. These new FCS upcode the amount of care required for the patients, to make it appear that the patients required more care, and therefore were

18

entitled to additional funding, over the entire period of time.

71g.    For example, all patients are documented to have Behavioral care issues,
        which warrants increased Medicare and Medicaid funding, whether they
        have such issues or not. Patients who complain about the care they
        receive, or complain about the care given to their roommates, are routinely
        documented as "interfering with the care of themselves or others" and
        documented as requiring a higher level of care. Such upcoding has
        occurred in, among others, patient XXX and I.

71h.    For example, some patients who were not admitted with wounds are made
        to appear as if wounds existed on admission.

71i.    These new FCS would then be back dated, and signed by either Defendant
        Rhinehardt or Edwards.

71j.    At times, Defendant Rhinehardt prepares 4 to 6 months of FCS in
        one sitting, and back dates the care to make it appear as if the FCS were
        written on the dates noted, instead of several months later.

71k.    These alterations of medical records occurred on Patients I, J, M, N, R, T,
        X, Y, AA, and DD.

71l.    In the case of patient AA, Ms. Scharff had documented on a nurses' note
        that she had prepared a FCS for patient AA. Upon review of the current
        FCS, it was discovered that the FCS Ms. Scharff had prepared for patient
        AA had been removed from the chart, and a new FCS written by Defendant

19

Rhinehardt was in its place.

71m.   Upon information and belief, these alterations of medical records occurred on many other patients of defendant Green Valley and Green Acres; and occurred while Defendant IHS owned the facility.

72 .   Patients who require hospice care are not being given such care, as a change in status from skilled nursing to hospice would decrease the Medicare and Medicaid funding received by Defendants Green Acres and Green Valley.  As a result, patients in need of hospice care do not receive hospice care.

72a.   Patient Z was dying in the summer of 2003.  Despite this fact, which was known to the patient and to the staff, he did not receive hospice care. The patient, who was fully alert and conscious, was not adequately treated for his pain and anxiety related to his impending death.

72b.   These care decisions were made directly by Defendants Casper and Edwards because such a change in care would decrease the amount of funding received by Defendants Green Valley and Green Acres.

72c.   The need of the patient for hospice care was deliberately disregarded to increase the funding received by Defendants.

72d.   Upon information and belief, this type of upcoding of patient care occurs on a regular basis at Defendant Green Valley and Green Acres.

72e.   Upon information and belief, this type of upcoding of patient care occurred on a regular basis while Defendant IHS owned the facility.

20

**B.    FALSIFIED DOCUMENTATION**

73.    Plaintiffs incorporate paragraphs one through 72 as though set out at length herein.

74.    As described above, Defendants Rhinehardt, Edwards, the Pavilions, Green Valley, and Green Acres have a routine practice of falsifying documents to increase Medicare and Medicaid funding to the facilities. Falsification of documents is in clear violation of Medicare and Medicaid regulations, as discussed above, that require accurate, reproducible documentation.

75.    The types of documents falsified include, but are not limited to, physician orders, verbal physician orders, functional care summaries, and Medicare and Medicaid certification and recertification documents.

76.    The types of falsifications include, but are not limited to, the falsification of physician signatures, the falsifications of medical and nursing records, and backdating of records.

77.    For example, these falsifications occurred on the functional care summaries of Patients I, J, M, N, R, T, X, Y, AA, and DD, among others. Existing FCS are removed from charts and destroyed; new FCS are created and backdated. Defendants Edwards and Rhinehardt are responsible for these actions.

78.    For example, these falsifications occurred on the verbal physician orders of patients FF, GG, HH, II, JJ, KK, LL, MM, NN, OO, PP, QQ, RR, and SS, among others. Defendant Rhinehardt creates false physician orders, which are never signed by the doctors, for the provision of range of motion exercises.

79.    For example, these falsifications occurred on the physician orders of patients to change orders for medical monitoring of patients who receive medications for hypertensive

21

conditions .

79a.    All medications that are given for high blood pressure require that the

patients' blood pressure be monitored before the drug is administered.

79b.    These patients are ordered to receive twice daily medications, and to have

their blood pressures monitored before each dose.

79c.    On a routine basis, this does not occur.  Patients on blood pressure

medicine do not have their blood pressures taken before administration of

the medicines.  This is a violation of the standard of care for the

administration of these medicines.

79d.    Defendants write verbal orders from physicians discontinuing this

monitoring, "because the patients have stable blood pressures," even

though no such blood pressure monitoring has occurred, and the

Defendants have no basis for reporting, and charting, that the patients have

stable blood pressures.

79e.    Falsifications also occurred on the administration of general medications,

including the backdating of medication administration records, to make it

appear as if medications had been given as ordered.

79f.    These types of falsification have occurred on, among others,  patients A,

N, O, P, Q, T, W, X, VV, EEE, BBBB, and CCCC.

80.    For example, these falsifications occurred on the Medicare certification and

recertification documents of, among others,  Patients B, F, H, K, EE, III, JJJ, KKK, LLL, MMM,

22

and NNN. These falsifications include falsifying doctor's signatures and backdating care.

81.    Upon information and belief, these types of falsifications of documents occurred on many other patients of Green Valley and the Pavilion.

82.    Upon information and belief, these types of falsifications of documents occurred on many other patients of Green Acres.

83.    Defendants Green Acres and Green Valley also allowed the falsification of records related to patient social leaves of absence.

83a.    Medicare regulations do not permit patients to leave the facilities for social leaves of absence. See 42 C.F.R. §409.34 (care must be provided on a daily basis in order to qualify). Medicaid regulations limit the amount of social leaves of absences patients may take in a year. See 42 C.F.R. §483.12

83b.    Defendants are aware of Medicare and Medicaid rules prohibiting or
limiting these social leaves of absence.

83c.    Despite this awareness, Defendants have permitted Medicare and Medicaid
patients to take social leaves of absence.

83d.    Despite this awareness, Defendants have permitted the creation of falsified
documents to conceal that Medicare and Medicaid patients were taking
social leaves of absence.

83e.    For example, such falsifications occurred on Patients Q, who was permitted
to leave the facility most weekends for one to two days per weekend. The
patient's records were altered to make it appear that she did not leave the

23

facility. Instead, the only record of patient Q's leaving was an in-house

book kept by the facility to document who had left.

## C.    SUBSTANDARD QUALITY OF CARE ISSUES

84.    Plaintiffs incorporate by reference paragraphs 1 through 83 as though set out at

length herein.

85.    Defendants Green Acres, Green Valley, IHS, Casper, Edwards, Rhinehardt and

Blake certify to Medicare and Medicaid that they provide adequate, or above adequate, quality of

care to the Medicare and Medicaid patients who reside inside their facilities; to maintain or

improve the quality of life of the residents, as required by Title XVIII and XIX of the Social

Security Act. Defendants sign these certifications in their reports to Medicare and Medicaid.

These certifications are required as per 42 C.F.R. Part 442.

86.    Defendants Green Acres, Green Valley, IHS, Casper, Edwards, Rhinehardt and

Blake certify to Medicare and Medicaid that they provide care to the patients in keeping with the

patients' diagnosis, diagnostic code, RUG, or level of care certified for each patient. These

certifications are required as per 42 C.F.R. Part 442.

87.    Despite these certifications, each and every one of these Defendants (Green Acres,

Green Valley, IHS, Casper, Edwards, Rhinehardt and Blake), individually and in concert, knew,

should have known, or are/were in reckless disregard for the fact that the care provided to

patients at their facilities is substandard, violative of the medical standards of care, and in violation

of applicable Medicare and Medicaid laws, rules, and regulations, making this care substandard

and a violation of the quality of care.

24

88.    Since 2003, Defendants Green Valley and Green Acres, Casper and Edwards provide substandard wound prevention care; as defined in part by 42 C.F.R. §483.25

88a.    Since the removal of Relator Scharff as the wound nurse in January, 2003 (who had previously served as the wound care coordinator at the Pavilion), these Defendants have failed to provide a full time wound care nurse on site.

88b.    These Defendants fail to provide adequate care to prevent the development of wounds in their patients, many of whom are partially or completely bedridden.

88c.    These Defendants fail to adequately turn the patients to prevent the development of wounds.

88d.    These Defendants fail to adequately move the patients out of bed to prevent the development of wounds.

88e.    These Defendants fail to provide adequate nutritional support to prevent the development of wounds. There is not a dietician on staff for an adequate amount of hours as required by state law and Medicare/ Medicaid regulations; and the diets offered to wound patients are substandard for the care and prevention of their wounds. The diets are traditional; there are no Diabetic diets offered in the facility. As a result, blood sugars rage out of control, thereby increasing the likelihood of wound development.

89.    Since 2003, Defendants Green Acres, Green Valley, Casper and Edwards have

25

provide substandard wound care after wounds have developed.  See, e.g., 42 C.F.R. §483.25.

89a.    Since January of 2003, when Relator Scharff, who had previously served as the wound care coordinate, was removed from that position to a staff LPN, the Pavilion has not had a full time wound nurse dedicated to provide oversight to the facility's wound care, insure that wounds do not occur; or that existing wounds would heal.

89b.    These Defendants fail to provide adequate care to insure that wounds heal, including but not limited to regular dressing changes; wound vac treatments; and other wound treatments.  Wound treatments are not given on a regular basis, as documented on the patient's Treatment Assessment Records; or are recorded as "refused" on a repeated basis.  This has occurred on patients S, Y, GGG, SSS and TTT; and occurs on many other patients.

89c.    Patient S has numerous wounds which never heal.  Despite this, treatments for the wounds do not occur.

89d.    These Defendants fail to provide adequate care to insure that wounds do not get larger, including but not limited to Patient S.

89e.    These Defendants fail to provide adequate care to insure that wounds do not get infected.

89f.    These Defendant fail to provide adequate dietary care to assist in the healing process.  As a result, wounds fail to heal.

26

89g.    In one case, Patient V, a blister on a lower leg remained inadequately
treated. The blister developed into a full scale wound. Patient V
eventually suffered a below the knee amputation of the affected leg due to
the inadequate care given to her blister.

89h.    Patient VVV at Green Valley Terrace, who has a wound for which she has
been ordered medical care, is allowed to apply her own feces and other
"treatments" to the wound as a "holistic treatment." Nursing records
indicate that this patient is receiving wound care which is actually not being
provided.

89i.    Patient records reveal that the majority of the wounds in the facilities are
caused by pressure against the beds, indicating that patients are not
adequately moved.

89j.    Patient records reveal that the majority of the wounds in the facilities are
infected by nosocomial sources, meaning that they are acquired inside the
facilities.

89k.    These Defendants fail to provide adequate wound care to the patients,
including having a dedicated wound nurse, and providing adequate
nutritional support. As a result, few wounds heal.

89l.    As a result of this poor care, most patients require surgical intervention,
including amputations.

90.    Many patients of Defendants Green Valley and Green Acres are diabetic, either

insulin dependent, or non-insulin dependent.

> 90a.   Due to the nature of their illness, diabetics need specialized care.
>
> 90b.   Insulin, a naturally occurring hormone, regulates the body's glucose levels.
>
> 90c.   Diabetics either fail to produce insulin, or fail to produce sufficient insulin
>        to metabolize the glucose in their bodies.
>
> 90d.   As a result, diabetic patients need special medications to control their
>        blood sugars.
>
> 90e.   Diabetics also need special diets to control their intake of glucose.
>
> 90f.   Diabetics also need special care to their skin and extremities, as they are at
>        a higher risk of skin breakdown and problems related to poor circulation.
>
> 90g.   Diabetics also require monitoring of their cardiovascular system, as they
>        are at a higher risk of suffering cardiovascular related diseases and
>        illnesses.

91.   Defendants Green Valley and Green Acres provide substandard care to the facilities' diabetic patients.      See, e.g., 42 C.F.R. §483.25 ("Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychological well-being, in accordance with the comprehensive assessment and plan of care.")

> 91a.   Defendants Green Valley and Green Acres fail to provide dietary care
>        to its diabetic patients.  There is insufficient dietary consultation on these
>        patients.  Defendants fail to provide the minimum care required by Federal

28

and state law for dietary consultations.  There are insufficient dietary staff

to provide these consultations.

91b.    Defendants Green Valley and Green Acres fail to provide diabetic foods to

these patients.  The patients are routinely served ice cream cones, and

peanut butter and jelly sandwiches.  An American Dietetic Association diet,

limiting the caloric intake of diabetics, is not offered at the facilities.

91c.    For example, patient Q, a diabetic, is allowed to leave the facility for home

visits on a regular basis.  When she is gone, Patient Q is not sent home with

her diabetic medications or with a blood sugar monitor.  When Patient Q

returns, her blood sugar is unstable.

91d.    For example, Patient X  is permitted to leave the facility, take the

handicapped public transportation bus to a local mall, and purchase fudge

for himself and the staff of the facility.  No attempts are made to limit this

behavior, despite his diagnosis as an insulin dependent diabetic.

91e.    These Defendants make no attempt to limit the sugar intake of these

patients.  Instead of providing adequate dietary counseling and menus, the

Defendants instead admonish the nurses not to order take-out food for

the diabetic patients.  Defendants then continue to serve these patients

foods including peanut butter and jelly sandwiches and Nutty Buddy ice

cream cones.

91f.    Defendants Green Valley and Green Acres fail to adequately monitor and

treat the blood sugar levels of the facilities' diabetics. Diabetics' blood sugars are measured inaccurately. The facility fails to adequately insure that blood glucose monitors are calibrated on a regular basis to insure accuracy. The Defendants also allow the nurses to use monitor strips that have not been calibrated to a particular monitor when taking a patients' finger stick blood sugar. These practices combine to insure an inaccurate result. Based upon these inaccurate results, diabetic patients are treated with insulin injections and other medications. As a result of these inaccuracies, most diabetic patients become unstable diabetics, thereby increasing their Medicare and Medicaid payments.

91g. As a routine matter, insulin is given so far in advance of food intake as to create unstable blood sugars. All patients, especially those on the Aspen and Sierra wings, receive their first morning dose of insulin up to four hours before intake of food, thereby creating unstable blood sugars.

91h. These Defendants fail to adequately respond to patient's blood sugar levels. Patient YYY had a finger stick blood sugar of greater than 400. Despite this reading, Defendant Jeff Blake refused to treat YYY. A certified nursing assistant reported this reading to Ms. Scharff. Three hours later, YYY, diaphoretic, vomiting, and short of breath, had her finger stick blood sugar retested by Defendant Blake. The reading was 300. Within minutes, YYY suffered cardiac arrest and died in Ms.

30

Scharff's presence.

91i.     As a direct result of these failures, patients suffer from unstable blood

sugars, thereby worsening their health.

91j.     Unstable blood sugars are a factor which allows Defendants to increase

their Medicare and Medicaid funding.

91k.     Defendants Green Valley, Green Acres, Casper and Edwards fail to insure

that diabetics receive proper medication for their diagnoses.  Frequent

medication errors related to the provision of insulin occur inside these

facilities.

91l.     Failure to insure proper medications for diabetics also increase the

likelihood of unstable blood sugars, leading to worsening of health, and

increased Medicare and Medicaid funding.

91m.     As a result of Defendants repeated, intentional, reckless failure to

adequately monitor and treat blood sugars, these patients develop unstable

blood sugars, leading to a worsening of their health, and resulting in

increased Medicare and Medicaid funding.

92.     Defendants Green Valley and Green Acres fail to adequately monitor patient intake

and output, resulting in patient illness and worsening of patient conditions.  These actions are in

direct violation of Medicare and Medicaid regulations.  See, e.g., 42 C.F.R. §483.25(g), (I) and

(j).

92a.     Nursing home patients are required to have their intake of food and liquids,

and output monitored. This monitoring is important to prevent dehydration and other illnesses.

    92b.    Part of this monitoring includes monitoring the bowel elimination of the patients.

    92c.    Part of this monitoring includes the monitoring of intake on patients who receive tube feedings, and therefore are unable to feed or hydrate themselves.

    93.    Defendants Green Acres and Green Valley, by and through Defendants Casper and Edwards, provide substandard care of the monitoring of patient intake and output, resulting in life threatening weight losses.

    93a.    Repeated failure to measure patient intake and output has resulted in life threatening weight loss.

    93b.    These instances of weight loss are not monitored; or, if monitored, Defendants repeatedly fail to take any action to resolve these problems, leading to other health consequences.

    93c.    Patient G had significant weight loss which was documented but not monitored or addressed by the Defendants. This patient subsists entirely on tube feeding; and requires full assistance for all activities; the only source of weight loss was that the patient did not regularly receive her tube feeding over the course of one month.

    93d.    Patient BB had significant weight loss over the course of one month which was documented but not monitored or addresses by the Defendants.

Patient BB eventually required hospitalization for dehydration, and died.

93e.  Patient O required additional medical treatment, as his weight loss was documented but not monitored, while the patient continued to receive Insulin injections regardless of the amount of food he was or was not ingesting. This same patient eventually developed a stage IV wound that required hospitalization to treat.

93f.  Patient S was ordered to receive 6 cans a day of liquid feedings via a gastrostomy tube, to be run as an every four hours feeding (not continuous). Despite this, on a routine basis, Patient S, who suffers from severe wounds and contractures, only received an average of 2 cans of liquid feedings per day over the course of several days.

93g.  As a result of the Defendants Green Acres, Green Valley, Casper and Edwards' failure to monitor intake and output, patients frequently suffer from dehydration, requiring hospitalization.

93h.  As a result of the Defendants Green Acres, Green Valley, Casper, and Edwards' failure to monitor intake and output, patients frequently require the surgical insertion of feeding tubes. These insertions would have been preventable if these Defendants took any steps to treat dehydration and weight loss in the facilities.

94.  Defendants Green Acres and Green Valley failed to monitor the intake of patients, resulting in severe health alterations, including but not limited to severe dehydration. These

actions are in violation of Medicare and Medicaid regulations, including but not limited to 42

C.F.R. §483.25 (g) and (j).

94a.    These dehydrated patients frequently required the insertion of gastrostomy

tubes. For instance, as described above, patient F required the insertion of

a G tube because he suffered from dementia; and few staff would insure

that Mr. F was fed on a regular basis.

94b.    Upon information and belief, the majority of the dehydration cases in the

facilities were related to the failure of nurses and other staff to insure

adequate intake of food and liquid, in violation of 42 C.F.R. §483.25 (g).

94c.    Other patients, who are required by their diagnoses to be on fluid

restrictions, are permitted to take their own liquids, including from the

facility's water coolers at the nurses' stations. This has occurred, for

instance, on patient ZZZ.

95.    Defendants Green Acres, Green Valley, Casper and Edwards provide substandard

care in the monitoring of patient elimination, resulting in serious illness, injury, and death.

95a.    For instance, repeated failure to monitor patient elimination has caused

several patients to require hospitalization for these failures. Patient SSS

died recently due to a severe bowel impaction caused by not having a

bowel movement over the course of several weeks.

95b.    Patient N was hospitalized twice, with blood tinged vomiting, due to

severe fecal impaction for over one month's time that had gone

34

unrecognized. This patient's illness was completely caused by the failure of

Defendants to monitor and respond to his lack of output.

95c.    Patient BB's flow sheet showed two bowel movements over the course

of 30 days. Despite this information, no follow up occurred; Defendants

failed to adequately monitor and/or treat Mr. BB for this problem for

thirty days.

95d.    The failure to monitor and treat lack of bowel movement occurs in many

Green Acres patients, including but not limited to Patient G.

96.    Defendants Green Valley and Green Acres provide substandard dietary care for

their patients.

96a.    Federal and state law mandate that Medicare and Medicaid patients receive

dietary consultation to improve and/or maintain their standard of living.    See, e.g., 42 C.F.R.

§483.15, requiring mandatory dietary services.

96b.    Delaware law, including but not limited to the Eagles' Law, requires that a

registered dietician, or its equivalent, provide services to nursing home

patients at a rate of 5 hours per 10 resident beds per month. At the

Pavilion, this would require a minimum of 75 hours per month.

96c.    At the Pavilion, a dietician is on site for a maximum of 12 hours per week.

Most weeks, a dietician is on site for 8 hours per week, which is below the

legal standard.

97.    As a result of this substandard dietary care, patients have been injured, and/or have

35

had serious impact to their health status.

       97a.    As noted above, diabetics do not receive adequate dietary support. As a result, these patients suffer unstable blood sugars. These unstable blood sugars allow the Defendants to receive more funding from the State and Federal government.

       97b.    Patient FFF , who was ordered a pureed diet, was found choking on his meal. Upon examination, Patient FFF was choking on a piece of beef, clearly not part of a pureed diet.

       97c.    Patients with wound care problems are not given dietary evaluations to determine the ability to assist in the healing process through their diet.

98.    Defendants Green Valley and Green Acres provide substandard care to their patients by failing to insure patients receive proper medications in a timely fashion. These actions are in violation of Medicare and Medicaid laws and regulations, including but not limited to 42 C.F.R. §483.25(m); and 483.60.

       98a.    Defendants Green Valley and Green Acres fail to provide proper instruction to the staff on the administration of medicines. As a result, frequent medication errors occur.

       98b.    Patients ordered new medications frequently do not receive those new medicines for over one weeks time. Defendants Green Acres and Green Valley fail to insure that the pharmacy provides medicines to patients on an as-needed basis.

98c. Patient EEE was ordered to receive Depakote, an anti-seizure drug, as a dose of 750 mg, split as one 250 mg pill, and one 500 mg pill. For over nine days, the patient never received the 250 mg pill from the pharmacy. As a result, the patient only received the 500 mg pill over that course of time. Nurses notes indicate that nurses were signing off on the Medication Administration Record as either having administered the drug, or held the drug.

98d. A blood level of the drug indicated that the patient was receiving a sub-therapeutic dose of Depakote. The patient's physician ordered an increase in the dosage of the Depakote to increase the patient's blood level of the drug. Fortunately for the patient, Ms. Scharff was the treating nurse, and was aware that, despite being signed out by other staff members, the patient could not have received the correct dosage of Depakote, and so informed the physician.

99. Defendants Green Valley, Green Acres, Casper and Edwards provide substandard care by failing to provide adequate nursing care. These actions are in violation of, among other sections, 42 C.F.R. §483.15 and §483.25; and 42 C.F.R. §409.31 and §409.32.

99a. These Defendants routinely assign patients the label of being "behavioral issues" and requiring "behavioral care" if the patients request assistance, complain about their living conditions, or require additional emotional support.

37

99b.   Once this "label" is applied to patients, these patients qualify for additional

payments under the Medicare and Medicaid systems. However, no

additional services in the way of psychological support, or other services as

required, for example, at 42 C.F.R. §483.25(f), are ever provided to these

patients labeled as requiring "behavioral care."

99c.   Once these patients are labeled as having behavioral issues, these

Defendants use that "label" to justify requests of physicians that these types

of patients receive psychotropic and/or psychological drugs to "control"

this behavior. There is no attempt to treat these patients through

psychological services.

99d.   Patients are unnecessarily medicated for behavioral issues in these facilities.

As a result of this overmedication, patients are lethargic, unable to move or

assist in their care, and often lose the ability to eat or drink due to lethargy.

Overmedication of patients is in direct violation of 42 U.S.C. §483.25 (I).

This over medication occurred in Green Acres patients including, but not

limited to, Patient BB.

99e.   As a result of this overmedication, patients lose weight, become lethargic,

and become dehydrated.

99f.   Such a situation has occurred with Patients I and BB.

100.   Patients at Defendant Green Acres and Green Valley receive substandard nursing

care when nurses perform actions for which no physician authorization, or order, exists.

38

101.   For example, Patient F had a gastrostomy tube inserted by an unqualified personnel to cover over the fact that the patient had personally removed the tube. As a result of this insertion by an unqualified person, Mr. F required hospitalization and suffered a worsening of his health.

101a.   Mr. F had a gastrostomy tube ("G tube") placed for the purpose of providing intermittent tube feedings. Mr. F also ate on a regular basis.

101b.   Upon information and belief, Mr. F had the tube placed because of dehydration. This dehydration was caused by the failure of nursing staff to insure that Mr. F had adequate intake, in the form of food and liquids. Mr. F's intake and output was not monitored on a regular basis. Calorie counts were not performed on a regular basis on Mr. F. These actions are in direct violation of, among other things, 42 C.F.R. §483.25(g).

101c.   Mr. F was mildly confused, and was a patient on the Alzheimer's unit, Sycamore wing.

101d.   Mr. F, in a confused state, pulled his G tube out of his stomach. There was no order in the chart for the facility to reinsert the tube if it were accidentally or purposefully removed.

101e.   Despite the lack of orders, a nursing supervisor at the Pavilion reinserted a tube into the site of Mr. F's G tube insertion site, without knowing how long the tube was out, or the circumstances of its removal.

101f.   Within one day, Mr. F showed signs of increased agitation and fever.

39

Upon information and belief, despite these signs, Mr. F was fed through the

G tube as if no problem had occurred.  There is no indication that Mr. F's

attending physician was notified of the pulling of the G tube, or the

reinsertion by a nurse at the facility.

101g.    After several days of increased agitation, fever, and drainage from the site

of the G tube insertion,  Mr. F required hospitalization for a suspected

perforation due to the re-insertion of the G tube, without physician

authorization, by a nurse.

102.    Defendants Green Valley and Green Acres provide substandard nursing care by

failing to treat patients after they have suffered an unwitnessed fall, or at any time after a fall.

102a.    Green Valley and Green Acres' own protocol requires a nurse to provide a

twenty four hour check on a patient who has suffered an unwitnessed fall.

102b.    Despite this protocol, Green Acres and Green Valley nurses fail to check

the patients' neurological status on a regular basis for the twenty four

hours after a fall.  This failure leads to potentially serious impairment of

the patients' neurological status, and overall health.

103.    Defendant Jeff Blake provides substandard nursing care by failing to treat patients

with respect and dignity, and by verbally threatening patients, or ignoring their requests for care.

In addition, Defendant Blake has threatened a staff member regarding Defendant Blake's

performance of substandard care.  This behavior is in violation of, among other things, 42 C.F.R.

§§ 483.13 ("the resident has the right to be free from verbal...and mental abuse.")("The facility

must not use verbal, mental, sexual or physical abuse."); 483.15; 483.25 ("Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being...").

     103a.  Patient P has been repeatedly verbally abused by Defendant Blake, requiring at one point in time the intervention of Ms. Scharff and other staff.

     103b.  Defendant Blake has repeatedly refused to provide Patient P with care, or withheld care requested by Patient P, solely because Defendant Blake did not "feel" like providing the care.

     103c.  Defendant Blake has also been verbally abusive to patients, including but not limited I and U.

    104.  Defendants Green Acres and Green Valley provide substandard nursing care by failing to provide sufficient adequate skilled nursing staff to care for the patients who are in their care.

     104a.  Defendants routinely fail to provide sufficient staff to cover the amount of patients who need care.

     104b.  The amount of staff at Green Valley Pavilion is far less than is required by the state of Delaware under the Eagles' Law.

     104c.  The amount of staff at Green Valley Pavilion is insufficient to provide the level of care required by Medicare and Medicaid.    Medicare and Medicaid require a sufficient number of nurses to provide nursing and related

services to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident, as determined by resident assessments and individual plans of care. That number of nurses is not present at Green Acres or Green Valley on a regular basis.

104d. The reason for this insufficient staffing is the fact that supervisory nurses are listed on the schedule as "staff" nurses, making the staffing for each shift appear to have, at a minimum, one more nurse than they actually have, caring for patients. In reality, the supervisory nurses provide no direct patient care, leaving patient care nurses to provide for, at times, double the number of patients that the staffing sheets would suggest.

104e. Defendants routinely provide substandard skilled nursing care. The provision of nursing care at the facilities is certified as skilled, when, for instance, L.P.N.'s are providing services required to be performed by registered nurses, including but not limited to IV services.

105. Defendants Green Valley and Green Acres provide substandard care, and submit falsified documents, by failing to properly bill Medicare Part B for medical supplies used by the patients. Since they are intimately involved in the billing for services at Green Acres' facilities, Defendants Allen Segal and Gary Segal knew, should have known, or were reckless disregard of this provision of substandard car and falsification of documents.

105a. Instead of providing each diabetic patient with their own supply of insulin needles and supplies, the facilities routinely charges diabetic supplies

42

(insulin syringes, lancets, alcohol wipes) to one patient, and then uses the supplies for whomever might need such supplies.

105b.  Instead of providing specialized beds to patients who require such, the facilities routinely provide specialized beds to wound patients regardless of need, to increase the funding for each patient.

105c.  When patients are provided with particular supplies which are reimbursable under Medicare Part B, they are appropriately charged for these supplies. However, when the patient no longer needs the supplies, the supplies are returned to the facility stock. No credit is given to the first patient for the return of the stock. Then, the stock is re-charged under Medicare Part B to another patient's account. These accounts amount to double billing Medicare Part B for supplies.

105d.  These Defendants also bill Medicare Part B for the provision of oxygen services without the required certificates of medical necessity.

105e.  These Defendants also bill Medicare Part B for bundled laboratory services, when only the individual lab tests are ordered or required.

106..  Defendants provide substandard pain relief care. These actions are in violation of Medicare and Medicaid regulations, since the failure to adequately medicate patients for ongoing pain is a failure to maintain or enhance each resident's quality of life. See, e.g., 42 C.F.R. §483.25.

106a.  Patients who suffer from pain in the facility frequently have to beg for their

43

pain medications, or go unmedicated and suffering from pain. This has occurred in Patient

AAAA. Nurses fail to adequately assess patients for pain; and fail to administer adequate pain

medication, despite being cited by Medicare, Defendants have failed to implement any Plan of

Correction to deal with pain issues.

106b.  Defendants Green Valley and Green Acres require and/or permit the

physician ordering of large amounts of "as needed" or "prn" pain

medications, but do not provide sufficient pain relief care to their patients,

as these prn medications are not administered on a regular basis.

106c.  Defendants Green Valley and Green Acres require nurses to destroy any

pain medicines, or controlled substances, on hand after sixty (60) days,

regardless of whether the medications have expired or not.

106d.  Defendants then order additional supplies of these controlled substances,

regardless of the supply on hand, in order to charge Medicare and

Medicaid for these medications, most of which are destroyed.

106e.  For instance, Patient Z was ordered pain and anti-anxiety medications. Mr.

Z had to repeatedly request these medications. Most of the nursing staff

refused to assess Mr. Z for pain, and refused to provide pain medications.

106f.  Despite having large supplies of pain and anxiety medications on hand,

Defendants re-ordered pain and anxiety medications for Mr. Z, then

required that the on-hand drugs be destroyed. At one point, up to 149

Ativan and 44 Oxycodone pills were destroyed due to this policy of

44

excessive ordering of medications; and failure to adequately treat pain.

106g.  Patients P and I have  repeatedly requested of Defendant Jeff Blake that

they receive pain medications.  Despite these repeated requests, Defendant

Blake refused to provide these requested pain medications.

106h.  Defendant Blake repeatedly fails to assess patients for pain, or to

administer pain medication to the patients, despite their need for such

medications.  Such actions by Defendant Blake include, but are not limited

to, failure to medicate Patient P when Patient P requested pain

medications.

## SPECIFIC ALLEGATIONS WITH RESPECT TO ████████████

107.  Plaintiffs incorporate paragraphs 1 through 106 as though set out at length herein.



108.

109.

110.

45

111.

112.

113.

114.

115.



116.

117.

118.

119.

120.

121.

122.

123.

Case 1:04-cv-00105-JJF    Document 30    Filed 05/09/2007    Page 49 of 84

123a.

123b.

123c.

123d.

48

**123e.**

**123f.**

**124.**

**124a.**

124b. 

125. 

125a. 

125b. 

125c.

125d.

126.

126a.

126b.



126c.

126d.

126e.

127.

127a.

127b.

127c.

127d.

127e.



127f.

127g.

127h.

127i.

127j.



**127k.**



**128.**



**128a.**



**128b.**



128c.

128d.

128e.

129.

129a.

129b. 

**SPECIFIC ALLEGATIONS WITH RESPECT TO** ▉▉



134.

135.

136.

136a.

136b.

137.

137a.



137b.

138.

138a.

138b.

138c.



139.

140.

141.

142.

143.

143a.

144.

145.

146.

147.

148.

148a.



148b.



149.

149a.

149b.

149c.

149d.

150.

151.

152.

153.

154a.

154b.

155.



155a. ███████████████████████████

156. ████████████████████████████████

███████████████████████████████████████

157. █████████████

158. ████████████████████████████████

████████████████████████████████████████

159. ████████████████████████████████

████████████████████████████████████████

160. ███████████████████████████████

161. ███████████████████████████████

████████████████████████████████████████

161a. ███████████████████████████

64



161b.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)
### AS TO DEFENDANTS IHS, GREEN ACRES HEALTH SYSTEMS,
### GREEN VALLEY PAVILION, GREEN VALLEY TERRACE,
### ALLEN SEGAL, GARY SEGAL, MARY CASPER, SANDY EDWARDS, DENISE
### RHINEHARDT, JEFF BLAKE,

162.    Plaintiffs incorporate by reference paragraphs 1 through 161 as though set out at length herein.

163.    These Defendants filed cost reports, and other documents, with the Federal government, seeking funds for the care of Medicare and Medicaid patients.

164.    These Defendants filed cost reports, and other documents, with the State of Delaware, seeking state and Federal funds for the care of Medicaid patients.

165.    Such other documents include but are not limited to Functional Care Summaries; Medicare Certification and Recertification documents; HCFA form 672, a census of the conditions of patients; Medicaid Add-On requests; and medical records documentation supporting care.

65

166.    These documents contained false statements.

167.    Having failed to accurately and truthfully apply for Medicare and Medicaid funding with the state and Federal Government, these Defendants falsely certified that the applications were true, complete, and accurate.

168.    These Defendants' actions, individually and in concert, created falsifications which were material to the Federal Government 's decision to expend funds for the care of the patients in Defendants' facilities.

169.    These Defendants' actions, individually and in concert, amount to False Claims upon the Federal Government.

170.    As a result of these Defendants' actions, the Federal Government has been injured.

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. §3729(a)(2)
## AS TO DEFENDANTS IHS, GREEN ACRES HEALTH SYSTEMS,
## GREEN VALLEY PAVILION, GREEN VALLEY TERRACE,
## ALLEN SEGAL, GARY SEGAL, MARY CASPER, SANDY EDWARDS, DENISE
## RHINEHARDT, JEFF BLAKE,

171.    Plaintiffs incorporate paragraphs 1 through 170 as though set out at length herein.

172.    These Defendants knowingly made, used, and/or caused to be made and used false documents to certify that they provide adequate care, sufficient to maintain and/or improve the quality of life of their Medicare and Medicaid patients.

66

173.    These documents were false because they (1) upcoded the level of care required for patients; (2) contained intentional or other falsifications; or (3) contained certifications of standards of care which were in reality substandard.

174.    These false documents were created with the intent of seeking Federal funds from the Federal Government.

175.    These false documents were sent to the Federal government.

176.    These false documents materially affected the decision to fund care of patients in the Defendants' facilities.

177.    These false documents were used by the Federal government to approve funding sought by these Defendants.

178.    These false documents were used to get a false claim paid by the Government.

179.    As a result of the creation and use of these false documents, the Federal government paid funds to these Defendants for care of patients who reside in Defendants' facilities.

180.    As a result of the false documents made by these Defendants, the Federal Government paid or approved the Defendants false claims for Medicare and Medicaid funds.

181.    The Federal government was damaged as a result of the actions of these Defendants.

67

**COUNT III**
**VIOLATION OF THE DELAWARE FALSE CLAIMS AND**
**REPORTING ACT, DEL. CODE TITLE 6, §1201(a)(1)**
**AS TO DEFENDANTS IHS, GREEN ACRES HEALTH SYSTEMS,**
**GREEN VALLEY PAVILION, GREEN VALLEY TERRACE,**
**ALLEN SEGAL, GARY SEGAL, MARY CASPER, SANDY EDWARDS, DENISE**
**RHINEHARDT, JEFF BLAKE,** ████████████████████████████

182.    Plaintiffs incorporate paragraphs 1 through 181 as though set out at length herein.

183.    These Defendants created for and/or filed documents with the State of Delaware government, seeking state funds for the care of Medicaid patients.

184.    Such other documents include but are not limited to Functional Care Summaries; Medicaid Certification and Recertification documents; HCFA form 672, or other census of the conditions of patients; and Medicaid Add-On requests.

185.    These documents contained false statements.

186.    Having failed to accurately and truthfully apply for Medicaid funding with the state of Delaware Government, these Defendants falsely certified that the applications were true, complete, and accurate.

187.    These Defendants' actions created falsifications which were material to the State of Delaware Government's decision to expend funds for the care of the patients in Defendants' facilities.

188.    These Defendants' actions, individually and in concert, amount to False Claims upon the State of Delaware Government.

68

189.    As a result of these Defendants' actions, the State of Delaware Government has

been injured.

## COUNT IV
### VIOLATION OF THE DELAWARE FALSE CLAIMS AND
### REPORTING ACT, DEL. CODE ANN. TITLE 6, §1201(a)(2)
### AS TO DEFENDANTS IHS, GREEN ACRES HEALTH SYSTEMS,
### GREEN VALLEY PAVILION, GREEN VALLEY TERRACE,
### ALLEN SEGAL, GARY SEGAL, MARY CASPER, SANDY EDWARDS, DENISE
### RHINEHARDT, JEFF BLAKE, ███████████████████████████

190.    Plaintiffs incorporate paragraphs 1 through 189 as though set out at length herein.

191.    These Defendants knowingly made, used, and/or caused to be made and used false

documents to certify that they provide adequate care, sufficient to maintain and/or improve the

quality of life of their Medicaid patients.

192.    These documents were false because they (1) upcoded the level of care required

for patients; (2) contained falsifications; or (3) contained certifications of standards of care which

were in reality substandard.

193.    These false documents were created with the intent of seeking Federal and State

funds from the State of Delaware Government.

194.    These false documents were sent to the State of Delaware government.

195.    These false documents materially affected the decision to fund care of patients in

the Defendants facilities.

196.    These false documents were used by the State of Delaware Government to

approve funding sought by these Defendants.

197.   These false documents were used to get a false claim paid by the Government.

198.   As a result of the creation and use of these false documents, the State of Delaware government paid funds to these Defendants for care of patients who reside in Defendants' facilities.

199.   As a result of the false documents made by these Defendants, the State of Delaware Government paid or approved the Defendants false claims for Medicaid funds.

200.   The State of Delaware was damaged as a result of the actions of these Defendants.

## COUNT V
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)
AS TO



201.

202.

203.

204.

205. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

206. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

207. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

208. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## COUNT VI
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(2)
### AS TO ▮▮▮▮▮▮▮▮

209. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

210. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

71



211.

212.

213.

214.

215.

216.

218.

219.

220.

## COUNT VII
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(7)
#### AS TO 

221. ███████████████████████

222. ███████████████████████

███████████████████████

223. ███████████████████████

███████████████████████

224. ███████████████████████

███████████████████████

225. ███████████████████████

███████████████████████

226. ███████████████████████

███████████████████████

227. ███████████████████████

73

228. 

## COUNT VIII
## VIOLATION OF THE DELAWARE FALSE CLAIMS AND
## REPORTING ACT, DEL. CODE TITLE 6, §1201(a)(1)
## AS TO

229.

230.

231.

232.

233.

234.

235.



## COUNT IX
### VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT, DEL. CODE ANN. TITLE 6, §1201(a)(2) AS TO

236.

237.

238.

239.

240.

241.

242.

243.

244.



245. ███████████████████████████████

246. ███████████████████████████████

## COUNT X
## VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### TITLE 6 DEL. CODE, §1201 (a) (7)
### AS TO ████



247. ███████████████████████████

248. ███████████████████████████████

249. ███████████████████████████████

250. ███████████████████████████████

251. ███████████████████████████



252.

253.

254.

## COUNT XI
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3730(h)
### PLAINTIFF WALTER T. DECYK, III,
### AS TO DEFENDANTS GREEN VALLEY AND GREEN ACRES

255.    Plaintiff Walter T. Decyk III, incorporates paragraphs 1 through 256 as though set forth at length herein.

256.    Beginning in February, 2003, Mr. Decyk repeatedly confronted Defendants, by and through Defendants Sandy Edwards and Mary Casper, about the falsifications of records; and substandard care, regarding care provided; and claims filed, with the Federal and State of Delaware Governments.

77

257. For instance, Mr. Decyk informed Defendants that the giving of insulin up to four hours before the ingestion of food was the cause of unstable blood sugars. As a result of Mr. Decyk's continued complaints, the Defendants changed the administration patterns for some, but not all, patients.

258. For instance, Mr. Decyk informed Defendants that it was illegal and improper to upcode and falsify the FCS on patients; and that the alleged PROM was unneeded, and being done improperly.

259. Defendants refused to acknowledge that these claims were false; or that substandard care was being provided.

260. Defendants retaliated against Mr. Decyk, and claimed that Walter T. Decyk III was a poor employee, or that his employment difficulties stemmed from personal disagreements with other employees. Such retaliation included, but was not limited to, repeated written warnings for actions without explanation of the basis for such warnings; repeated written warnings related to actions Mr. Decyk did not perform; failure to report and reprimand another employee who physically and verbally threatened Mr. Decyk; written warnings related to claims that Mr. Decyk failed to appear for work as scheduled, despite knowledge that such work scheduling was in error; and written warnings that Mr. Decyk failed to prepare a FCS on a patient whom had already had a FCS prepared on his chart.

261. This last warning is of crucial importance to this case. Mr. Decyk received a written warning for the alleged failure to write a FCS for a patient. Upon investigation, Mr. Decyk found that the FCS had been written another staff nurse. This same FCS was later

78

removed from the chart and replaced by one written by Defendant Rhinehardt.

262.     After he became aware of the false claims filed by the Defendants, and, in particular, by Defendants Edwards and Rhinehardt, Mr. Decyk reported these false claims to Defendants Green Valley and Green Acres. Mr. Decyk also complained repeatedly to Defendants Edwards, Rhinehardt, and Casper at nurses' meetings, and other forums.

263.     Defendant failed to take action to investigate these false claims, or to rectify these problems.

264.     Defendants made no complaints about the quality of Plaintiff's work product or his interaction with others in the workplace until approximately June, 2003, when Plaintiff discussed the false claims, and substandard care, with the Defendants. Despite his complaints, Mr. Decyk received a small raise in August, 2003.

265.     In response to repeated written warnings, Mr. Decyk was terminated in October, 2003, without sufficient notice.

266.     As a result of his actions in support of the False Claims Act, Plaintiff Walter T. Decyk, III, suffered employment retaliation by Defendants by and/or through its agents, servants, and/or employees, acting by and for the other Defendants.

267.     As a result of the defendants' actions, Mr. Decyk has suffered wage loss resulting from Plaintiff's inability to find employment in his field of work, nursing, due to constant retaliation.

268.     As a result of the defendants' actions, Plaintiff, has been maligned and slandered by Defendants, by and/or through its agents, servants, and/or employees; and by other defendants.

269.    As a result of the defendants' actions, Mr. Decyk has suffered emotional distress, anguish, and suffering.

270.    As a result of the defendants' actions, Mr. Decyk has suffered other damages.

## COUNT XII
### PLAINTIFF WALTER T. DECYK, III VERSUS DEFENDANTS GREEN ACRES HEALTH SYSTEMS AND GREEN VALLEY PAVILION VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT, DEL. CODE TITLE 6 §1208

271.    Plaintiff Walter T. Decyk III, incorporates paragraphs 1 through 270 as though set forth at length herein.

272.    Beginning in February, 2003, Mr. Decyk repeatedly confronted Defendants, by and through Defendants Sandy Edwards and Mary Casper, about the falsifications of records, and substandard care, regarding care provided; and claims filed, with the Federal and State of Delaware Governments.

273.    After he became aware of the false claims filed by the Defendants, and, in particular, by Defendants Edwards and Rhinehardt, Plaintiff Mr. Decyk reported these false claims to Defendants Green Valley and Green Acres. Mr. Decyk also complained repeatedly to Defendants Edwards, Rhinehardt, and Casper at nurses' meetings, and other forums.

274.    Defendant failed to take action to investigate these false claims, or to rectify these problems.

275.    Defendants made no complaints about the quality of Plaintiff's work product or his interaction with others in the workplace until after June, 2003, when Mr. Decyk discussed the

80

false claims, and substandard care, with the Defendants. Despite his complaints, Mr. Decyk received a small raise in August, 2003.

276.    In response to repeated written warnings between September and October, 2003, Mr. Decyk was terminated in October, 2003, without sufficient notice.

277.    As a result of his actions in support of the Delaware False Claims and Reporting Act, Plaintiff Walter T. Decyk, III,  suffered employment retaliation by Defendants by and/or through its agents, servants, and/or employees, acting by and for the other Defendants.

278.    As a result of the defendants' actions, Mr. Decyk has suffered  wage loss resulting from Plaintiff's inability to find employment in his field of work, nursing, due to constant retaliation.

279.    As a result of the defendants' actions, Plaintiff, has been maligned and slandered by Defendants, by and/or through its agents, servants, and/or employees; Defendant;  and other defendants.

280.    As a result of the defendants' actions, Mr. Decyk has suffered emotional distress, anguish, and suffering.

281.    As a result of the defendants' actions, Mr. Decyk has suffered other damages.

## DAMAGES SOUGHT

282.    Plaintiffs incorporate paragraphs 1 through 281 as though set out at length herein.

283.    As a result of the actions of all Defendants, acting individually and in concert, as alleged in Counts I and II, the Federal Government has been damaged.

284.    The specific amount of these damages are in excess of $100,000.

81

285.    As a result of the actions of all Defendants, acting individually and in concert, as alleged in Counts V, VI, and VII, the Federal Government has been damaged.

286.    The specific amount of these damages are in excess of $100,000.

287.    As a result of the actions of all Defendants, acting individually and in concert, as alleged in Counts III and IV, the State of Delaware has been damaged.

288.    The specific amount of these damages are in excess of $100,000.

289.    As a result of the actions of all Defendants, acting individually and in concert, as alleged in Counts VIII, IX, and X, the State of Delaware has been damaged.

290.    The specific amount of these damages are in excess of $100,000.

291.    As a result of the actions of Defendants Green Acres and Green Valley, as to Count XI and XII, Plaintiff Walter T. Decyk III has been damaged.

292.    Plaintiff Walter T. Decyk III's damages are estimated as his yearly salary, in the amount in excess of $50,000; plus any additional pay increases and interest as available; double back pay and forward pay; personal emotional distress and suffering as a result of the actions of the defendants, and the slanderous statements made by the defendants; attorneys fees and costs; and any and all other costs and damages as permitted by law.

WHEREFORE, Plaintiffs ex rel. seek Judgment on behalf of the United States Government and the State of Delaware; treble damages as allowed by statute; civil penalties in an amount of $5,500 to $11,000 per False Claim filed; attorneys fees and costs as allowed by statute; back pay and forward pay times two for employment retaliation; interest on back pay; compensation for special damages related to the employment retaliation, including litigation costs

and reasonable attorneys fees; and any and all other costs as allowed by statute or rule of court.

REGINA D. POSERINA
Attorney for Plaintiffs ex rel. Sherry Scharff, L.P.N.,
and Walter T. Decyk, III, L.P.N.
7415 West Chester Pike
Upper Darby, PA 19082
(610) 352-0760

CHARLES BUTLER
Attorney for Plaintiffs ex rel. Sherry Scharff, L.P.N.,
and Walter T. Decyk, III, L.P.N.
1224 N. King Street
Wilmington, DE 19801
(302) 655-4100

83